IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                             :
UNITED STATES OF AMERICA,     :        Criminal Action
                             :
              Plaintiff,      :        No.  2:14-cr-114
                             :
v.                            :
                             :        Date:  February 25, 2015
RONALD BARNETTE,              :
                             :
              Defendant.      :
_____x
```

TRANSCRIPT OF SENTENCING HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA MEREDITH G. THOMAS
                           U.S. Attorney's Office
                           P.O. Box 1713
                           Charleston, WV  25326-1713

For the Defendant:         MICHAEL B. HISSAM, ESQ.
                           Bailey & Glasser
                           209 Capitol Street
                           Charleston, WV 25301-1386

Probation Officer:         Joshua Smith-Shimer


Court Reporter:            Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1        PROCEEDINGS had before The Honorable Thomas E. Johnston,

 2   Judge, United States District Court, Southern District of West

 3   Virginia, in Charleston, West Virginia, on February 25, 2015, at

 4   10:04 a.m., as follows:

 5             COURTROOM DEPUTY CLERK:  The matter before the Court is

 6   the United States of America versus Ronald Barnette, criminal

 7   action number 2:14-cr-00114, scheduled for sentencing.

 8             THE COURT:  Good morning.  Will counsel please note

 9   their appearances?

10             MS. THOMAS:  Meredith Thomas on behalf of the United

11   States.

12             MR. HISSAM:  Mike Hissam on behalf of the defendant,

13   Ronald Barnette, who is present in the courtroom.

14             THE COURT:  Good morning.

15        Mr. Barnette, will you please stand, and I will ask the

16   deputy clerk to administer an oath to you at this time.

17             COURTROOM DEPUTY CLERK:  Please raise your right hand.

18             RONALD BARNETTE, DEFENDANT, SWORN

19             THE COURT:  You may be seated.

20        Mr. Barnette, do you understand that you are now under oath

21   and you must tell the truth and, if you testify falsely, you may

22   face prosecution for perjury or for making a false statement?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  All right.  Throughout the course of this

25   hearing, if there's anything that occurs that you don't
```

1    understand, I want you to feel free to speak up and seek

2    clarification.

3        Also, if at any time you need to confer with your attorney,

4    I'll be pleased to pause the proceedings to allow you to do so.

5        Do you understand all that?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  All right.  Mr. Hissam, have you received

8    and read and reviewed with your client a copy of the Presentence

9    Report?

10           MR. HISSAM:  Yes, Your Honor.

11           THE COURT:  All right.  And, Mr. Barnette, I recall

12   from the plea hearing that you have a little bit of difficulty

13   reading.  Have you received and read and reviewed with your

14   counsel a copy of the Presentence Report?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  Did you have any difficulty reading the

17   Presentence Report?

18           THE DEFENDANT:  No, sir.

19           THE COURT:  All right.  So you were able to understand

20   it satisfactorily?

21           THE DEFENDANT:  Yes, sir.

22           THE COURT:  All right.  Mr. Hissam, I note that there

23   were some -- there really aren't any objections, but there's some

24   clarifications you were making with regard to the net worth

25   analysis.  I believe those have been noted by way of your

1    objection and perhaps some footnotes in the Presentence Report.

2    Is there anything live on that, at this point?

3    MR. HISSAM:  There are no outstanding objections to the

4    Presentence Report, Your Honor.

5    THE COURT:  All right.  Very well.  Then, I will adopt

6    the Presentence Report and addendum, as written.

7    I would note that I received sentencing memos from both

8    parties, as well as letters of support on behalf of the

9    defendant.

10   Those were copied to you, Ms. Thomas.  Have you seen them?

11   MS. THOMAS:  Yes, Your Honor.

12   THE COURT:  All right.  Mr. Hissam, would you like

13   those to be made part of the record?

14   MR. HISSAM:  Yes, Your Honor.

15   THE COURT:  Any objection?

16   MS. THOMAS:  No, Your Honor.

17   THE COURT:  All right.  That will be so ordered.

18   On July 14th, 2014, the defendant appeared before this Court

19   and entered a plea of guilty to a single-count information which

20   charges him with making a false statement in violation of 18 U.

21   S. C. 1001(a)(2).  I deferred a factual basis finding at that

22   time.

23   A couple of things about the factual basis I want to discuss

24   briefly.  The first one relates to the sentencing memorandum

25   filed by the defendant and, Mr. Hissam, I think I might have a

1     little bit of a bone to pick with you on this.

2             MR. HISSAM:  Okay.

3             THE COURT:  I want to start out on this point with the

4     Stipulation of Facts.  Do you have that handy?

5             MR. HISSAM:  Yes, sir.

6             THE COURT:  All right.  On the second page of the

7     Stipulation of Facts -- well, first of all, not only your client

8     signed off on that, but you did, as well, correct?

9             MR. HISSAM:  That's correct, Your Honor.

10           THE COURT:  All right.  And, in the Stipulation of

11    Facts, it very clearly states, this is in relation to the meeting

12    that the defendant had with a number of law enforcement agents on

13    March 22nd, 2014.

14       The stipulation very clearly states, "The agents directly

15    asked Mr. Barnette whether he ever paid cash kickbacks to Known

16    Person 3," which I think, at this point, we all know is Runion.

17    "Mr. Barnette falsely stated that he had not, which as he well --

18    as he then well knew, was not true."

19       Now, you signed off on that stipulation, did you not?

20           MR. HISSAM:  Yes, sir.

21           THE COURT:  All right.  Now, in your sentencing

22    memorandum, you said the following:  "Ronnie," Mr. Barnette,

23    "truthfully denied that he was currently paying kickbacks to

24    Runion, but Ronnie failed to correct the agent's misapprehension

25    that he had not historically paid kickbacks to Runion in

1    connection with Mt. Laurel work, saying instead, that he would

2    rather not answer."

3        I can't reconcile those two statements, Mr. Hissam, and I

4    have a real problem, because I've seen this happen before, with

5    counsel coming in in sentencing memorandums trying to minimize

6    the conduct of defendants in a way that flies in the face of

7    stipulations that they, themselves, have signed off on.  So, what

8    do you have to say about that?

9            MR. HISSAM:  Your Honor, I understand that the

10   stipulation is -- the word "ever" in the stipulation on Page 2

11   presents a problem.  It concerns me.  It concerns me that it was

12   not artfully drafted in a way to fit with Mr. Barnette's

13   statement and MOI, the Memorandum of Interview, from that date.

14           THE COURT:  You signed off on this.

15           MR. HISSAM:  I agree.  I understand, Your Honor, and

16   the Probation Report, as of that Memorandum of Interview, and as

17   of Mr. Barnette's statements later, after the plea, there was a

18   debrief in July with Ms. Thomas and the case agents, and there

19   was an interview with Probation, and that's reflected in

20   Paragraph 71 of the PSR as to Mr. Barnette's statement.

21       This was also briefed, Your Honor, in September by the

22   defendant in his response to the government's Memorandum of Law

23   regarding the definition of "willfully" where, in the last

24   paragraph of that memorandum, on Page 2, and this was docket

25   entry 15 filed by the defendant on September 12th.

1    The same statement was made that's consistent with the

2    sentencing memo and consistent with the Memorandum of Interview,

3    that, "Mr. Barnette understands that he misled the agents as to

4    whether he had historically paid kickbacks, as to say whether he

5    had ever paid kickbacks."

6    Had he ever paid kickbacks to Runion, he understood that

7    they left his home that day, March 22nd, believing that he had

8    not.  Now, he also believed he was -- he was sort of limiting

9    what he was saying.  He was trying to be careful.  He now

10   realizes that he wasn't careful, and that's consistent, Your

11   Honor, completely consistent, with the Memorandum of Interview

12   that was provided to Probation and that's written up in the final

13   Presentence Report.

14   And, in the statement, Your Honor, it says, "Ronald Barnette

15   was asked about placing a bid for a job at Mt. Laurel."  It's in

16   a compound sentence.  "If he ever" --

17           THE COURT:  Where are you?  Where are you?

18           MR. HISSAM:  This is in the Memorandum of Interview,

19   Your Honor.

20           THE COURT:  I don't have that.

21           MR. HISSAM:  Sure.  I'm describing this from the

22   Presentence Report and I --

23           THE COURT:  Well, I've seen the Presentence Report, and

24   that's really not what the Presentence Report says.  The

25   Presentence Report seems pretty consistent with the stipulation

1    and inconsistent with your sentencing memorandum.

2        MR. HISSAM:  Your Honor, in Paragraph 60 of the

3    Presentence Report, and this is describing that Memorandum of

4    Interview dated March 22nd of 2014, Paragraph 60, if you go to

5    the second sentence, Mr. Barnette was asked if he was required to

6    pay a kickback.  Mr. Barnette stated that he did not want to

7    answer that question.  That is entirely consistent with --

8        THE COURT:  No, no.  Go to the next sentence.

9    "However, Ronald Barnette said he never paid anyone money for

10   work."

11       MR. HISSAM:  Right, and then there's two things there,

12   Your Honor.  First of all, is Mr. Barnette understands that he

13   was asked, "Do you pay kickbacks?  Do you pay kickbacks at Mt.

14   Laurel?"  He took that to mean, in the present tense, currently,

15   do you pay kickbacks, and he answered no.

16       THE COURT:  That's not what the stipulation that you

17   signed off on and that the defendant affirmed at his plea hearing

18   was true.  That's not what it says.

19       MR. HISSAM:  Your Honor, that is his understanding of

20   that stipulation.  That is his understanding of what he was

21   asked.  It's consistent with the Memorandum of Interview.  It's

22   consistent with the PSR.

23       THE COURT:  I don't have the Memorandum of Interview

24   and I really don't want to hear anymore about that.

25       MR. HISSAM:  Paragraph 60, Your Honor --

THE COURT: I'm tired of listening to your parsing of this. Let me see if the government stands by their stipulation.

MS. THOMAS: Yes, Your Honor, we do.

THE COURT: Do you -- is it the government's position that the defendant affirmatively stated that he never paid kickbacks during the March 22nd interview?

MS. THOMAS: That's correct, Your Honor.

THE COURT: All right. Well, Mr. Hissam, I've got a real problem with the way you've handled this, all right, and we may have further conversations about this, but I'm not going to penalize your client for it. Your client came in here and affirmed the stipulation of facts and I generally am not going to penalize clients for stupid things that lawyers say in their -- in their filings, but I've got a real problem with you signing off on a stipulation and then trying to undermine it with your sentencing memorandum. It's a conversation you might -- you and I might have in the future.

MR. HISSAM: Your Honor, and I would just note, if I may?

THE COURT: I'll hear you. I'll give a little bit more time on this, but I've had about enough of this.

MR. HISSAM: That the statement, as reflected in the sentencing memorandum, is consistent with the acceptance of responsibility paragraph as found by the probation officer in Paragraph 71, and is consistent with the brief that was filed

1   with this Court in September; and third, and finally, Your Honor,

2   Ms. Thomas's statement as -- when asked by the Court just a

3   second ago about Mr. Barnette's statement, is inconsistent, and I

4   know the Court does not have the MOI before it, but Paragraph 60

5   of this PSR is a finding based on a review by the probation

6   officer of that document, of that MOI, and her response to the

7   Court is flatly inconsistent with that document and with

8   Paragraph 60.

9           THE COURT:  You're accusing her of an inconsistency.

10  That's ironic.  You seem to have a keen appreciation of irony

11  here, Mr. Hissam, but here's my problem with this.  All right?

12      The law is that concealment of a material fact is sufficient

13  for culpability under the statute.  The problem I have with this

14  is that there's this statement that the defendant -- that you're

15  relying on that the defendant said he didn't want to answer the

16  question.  Well, that's a little bit different than concealment

17  because it certainly raises the inference that he's hiding

18  something.  It's not totally concealment.  It raises a whole can

19  of worms, in my opinion, about whether or not concealment would

20  fit.

21      Now, that's the problem I have with this.  That's why I'm so

22  irritated by this, because it really -- if I accept your version

23  of what happened, it really creates a problem, I think, that has

24  to be examined in terms of the factual basis, but the problem is

25  that your client, and you, signed off on a very explicit

1   Stipulation of Facts.

2          MR. HISSAM:  I agree, Your Honor, and I will only note

3   that we did so in the context of plea negotiations with Mr. Ryan

4   and we did so with a full understanding Mr. Barnette understood

5   the plea agreement and I understand the import of the Court's

6   colloquy.

7          When this Court, at the plea hearing in July, raised the

8   issue of willfulness, everybody, Ms. Thomas -- Mr. Ryan was gone,

9   by that point, but Ms. Thomas, Mr. Barnette, and myself dug back

10  into this issues because the Court had raised the issue of

11  willfulness.

12         Ms. Thomas and I exchanged letters.  It was during the

13  context of that correspondence, Your Honor, that I saw for the

14  first time the Memorandum of Interview that's referred to in the

15  Probation Report and that I've referred to here today.

16         I understand, Your Honor, that it is a difficult issue.  I,

17  myself, was very troubled by the contents of this Memorandum of

18  Interview and it was again addressed in the context of this

19  Court's question about the willful element and the change in the

20  law and the United States' change in position as to the meaning

21  of "willfulness" for purposes of 1001, that we dug back into this

22  issue, and that I saw this source material for the first time.

23         And that was the context of my letters with Ms. Thomas, that

24  we reached an agreement, we reached what I considered to be a

25  sufficient factual and legal basis as set forth in the Memorandum

1    of Law that was filed on September 12th, but I do understand,

2    Your Honor, that it was a difficult and close issue as to the

3    factual and legal basis for the charge in the plea agreement.

4            THE COURT:  Well, it wasn't difficult for me until I

5    heard about this.  Perhaps I need to look at this Memorandum of

6    Interview.

7            MR. HISSAM:  I have clean copies, Your Honor, I would

8    be happy to provide to the Court.

9        May I approach?

10           THE COURT:  You may.

11           MR. HISSAM:  If I may provide your law clerk with a

12   copy?

13           THE COURT:  No.  He'll get one from me, if he needs it.

14       All right.  This looks consistent with the Presentence

15   Report, which looks consistent with the stipulation.

16       Ms. Thomas, I mean, is there anything more out there than

17   this Memorandum of Interview?

18           MS. THOMAS:  No, and I'll note, just for the record,

19   that this is not a transcript of the interview.  It wasn't taped.

20   So we don't have a word-for-word quotation of what happened and I

21   think that Mr. Hissam is talking about that first -- second full

22   paragraph on that second page.  It's reflected that Mr. Barnette,

23   when he was asked about whether he was required to pay a

24   kickback, he said he didn't want to answer that question.  I

25   mean, that's a little different than, "Did you pay a kickback,"

1  and so, I'll just make that distinction, "Were you asked to pay"

2  versus "Did you pay," but, you know, the Stipulation of Facts

3  speaks for itself.

4       THE COURT:  Well, it -- the Report of Interview says,

5  "Ronald Barnette advised he never paid anyone money for work."

6  That's pretty categorical.  It also says on the first page,

7  "They," meaning the defendant and his wife, "stated they never

8  paid anyone to get work at Mt. Laurel."  That seems to me to be

9  entirely consistent with the stipulation, but inconsistent with

10  the sentencing memorandum.

11       MR. HISSAM:  Now, Your Honor, I -- I think Mr.

12  Barnette's statements, as they're reported here and as they're

13  reported to the probation officer in Paragraph 71, are consistent

14  with -- he understands that he had misled the investigators as to

15  whether he had made kickback payments to Runion.  He still

16  believes that he did not -- and I think this is clear from our

17  sentencing memo -- that he did not have to pay to play to get

18  work at Mt. Laurel because he had worked before the payments were

19  ever demanded or made, and a significant amount of work, more

20  than $3,000,000.00 worth of work, after he quit voluntarily

21  making payments to Mr. Runion.  So Mr. Barnette did believe, and

22  still does believe, and I don't think that the Stipulation of

23  Facts addresses the issue of whether he paid to get work at Mt.

24  Laurel.

25       That is not how we interpreted the kickbacks.  I don't

1    believe that that's how Mr. Ryan interpreted kickbacks.  We had a

2    series of discussions about this very issue, that Mr. Barnette

3    and his company had work before, they received a demand for

4    payments, they made payments, they had a significant amount,

5    millions of dollars worth of work afterward and, therefore, there

6    was not a factual basis consistent with a pure pay to play in

7    which he starts making payments to obtain work at Mt. Laurel and

8    that's -- so I do take issue with that recitation of the

9    statements.

10         Now, I understand that on the second paragraph --

11         THE COURT:  So you take issue with the Memorandum of

12   Interview?

13         MR. HISSAM:  No.  I believe he did say that he did not

14   pay to obtain -- he did not pay anyone money for work at Mt.

15   Laurel, and that's consistent with the sentencing memo and with

16   his position today, because he had significant work before Runion

17   approached him, and he had significant work after he quit paying

18   Runion.

19         And so, and this, Your Honor, goes to the issue and the

20   legal argument we've had over this so-called bid rigging scheme.

21   The reason that Mr. Runion -- that the PSR and Mr. Runion's

22   charging instrument separate Mr. Barnette into a separate scheme

23   is that the fact pattern here was not consistent with Mr.

24   Barnette paying to play in a scheme.

25         He was doing work at Mt. Laurel.  He received a demand and

he paid.  He stopped paying Runion and he still had work.

THE COURT:  Well, why would he make the payments?

MR. HISSAM:  Because Mr. Runion demanded them.

THE COURT:  You know, somebody comes along and demands money from you, you're going to say, "Get out of here."

MR. HISSAM:  Sure.

THE COURT:  Unless there's some threat.

MR. HISSAM:  Absolutely, Your Honor.  There's --

THE COURT:  And threat is that you'd lose the business, and that is pay to play, isn't it?

MR. HISSAM:  I think it is, Your Honor.  It's just important that it's not --

THE COURT:  That's exactly the opposite of what you just said.

MR. HISSAM:  No, Your Honor, it's not work -- to obtain work in the first instance, and it's actually confirmed here, when he quits paying, he still has $3,000,000.00 worth of work in 2012 after he's quit paying, and $3,000,000.00 worth of work in 2013.

I understand the threat.  He understood -- Mr. Barnette understood the threat.  That's why he paid.  That's why he knows that he misled the investigators as to whether he had historically paid, but it's not consistent with -- there are other statements where he understands that he was dancing around the questions, as reflected here.

1    Now, the Stipulation of Facts, Your Honor, is -- comes up in

2    the context of plea negotiations where you have a client and a

3    client's wife who were speakers.  You have several case agents

4    who were in their home.  Ms. Thomas is absolutely right.  There

5    is no transcript, there is no audio recording, and counsel is

6    negotiating a Stipulation of Facts, with Mr. Barnette's consent

7    and with his approval, without having this document, and the only

8    issue I raised, Your Honor, is that after the Court raised a

9    concern about the factual and legal basis, and I understand that

10   that was triggered by this willfulness element, everybody went

11   back into the thicket on this issue, and that was when the

12   letters were exchanged, that's when the brief was filed, and

13   that's the -- and around that same time, Your Honor,

14   September 18th, the defendant was interviewed by the probation

15   officer, and the statements in Paragraph 71 of the PSR, which Ms.

16   Thomas did not object to, is consistent with the brief and

17   consistent with the sentencing memorandum, Your Honor.

18        THE COURT:  Ms. Thomas, can you make sense of all of

19   this?

20        MS. THOMAS:  I'm a little confused about some of it,

21   but I -- I don't think that the definition of "willfully" affects

22   what happened that day or affects the facts.

23        THE COURT:  I don't really see how it does either.

24   That's a separate issue I want to discuss with you all, but

25   that's -- what I'm trying to get at right now is, it looks to me,

1    from the stipulation, from the Presentence Report, and from the

2    Memorandum of Interview, that this defendant made affirmative

3    false statements to these agents, which is what I believed all

4    along, and apparently what you believe.

5            MS. THOMAS:  That's the United States' position.  And

6    I'd also bring up, in regard to the whole "I didn't think these

7    were kickbacks" conversation that just happened, again, in the

8    Stipulation of Facts, it says that "Mr. Barnette acknowledged

9    that the payments were wrong, but he believed they were necessary

10   at the time to retain the work for MRS at Mt. Laurel."  Well,

11   that sounds like a kickback to me.

12           THE COURT:  All right.  I'm going to take a moment and

13   look at this Report of Memorandum of Interview again and perhaps

14   count to ten before I proceed, so I'm going to take about a

15   ten-minute break.

16       (Recess taken).

17           THE COURT:  All right.  I have reviewed the materials

18   again.  I'm going to put the -- a copy of the Memorandum of

19   Interview in the record for this proceeding, but I still don't

20   see how one can look at this Memorandum of Interview, the

21   Stipulation of Facts, and the Presentence Report, and not

22   conclude that this defendant made an affirmative false statement

23   to these agents and I am going to find a factual basis to that --

24   to the extent of that issue based on an affirmative false

25   statement, not misleading, not concealing, an affirmative false

 1    statement.

 2         And, Mr. Hissam, I don't like these kinds of issues.  If you

 3    want to raise factual disputes, I suggest you go to trial.

 4    Otherwise, I suggest that you, for purposes of a guilty plea in

 5    the future, you had better be on the same page with the

 6    government.  I will not hear these kinds of parsing arguments

 7    again.

 8         And, lastly, if there was some concern raised by this

 9    Memorandum of Interview, which now that I've looked at it, I

10    don't really see, my question is, if you're doing your job, how

11    could you plead this defendant guilty to this crime without

12    seeing that Memorandum of Interview?  Obviously, there would be

13    such a document.  I don't know why you wouldn't have asked for

14    it.  So, those are a couple of practice pointers for you in the

15    future.

16         Now, I want to move on to this word, troublesome word,

17    "willfully."  I've looked at the parties' memoranda.  I -- and I

18    believe, as of today, the law in the Fourth Circuit is set forth

19    in the *Daugherty* case.  I understand the concern that the courts,

20    in general, are probably -- may be -- let me put it this way --

21    may be drifting toward this intermediate position that requires

22    -- that the word "willfully" requires that the defendant have

23    some general knowledge of the unlawfulness of his conduct.

24         I really don't think that's a standard that -- personally, I

25    don't think that's a standard that makes much sense.  Either you

knew it was unlawful or you didn't.  Either you knew it was a
violation of the law or you didn't.

This notion of a general understanding of the unlawfulness
of conduct, frankly, I think is a slippery concept that
potentially doesn't do a very good job of putting defendants on
notice of what offense conduct is or what is prohibited by the
law.  So, and I would -- I would find that, with regard to the
word "willfully," under *Daugherty*, we already have an adequate
factual basis.

Now, I think, based on another comment in the sentencing
memorandum of the defendant and, by the way, I generally -- my
practice is, unless it's agreed to, I generally am not going to
rely on comments of counsel in sentencing memoranda either to
defeat a basis in fact or to complete it.  So -- but Mr. Hissam
does say in his sentencing memorandum that the defendant had a
general understanding of the unlawfulness of his conduct when he
was not truthful with these agents.

My proposal then is, I have a couple of questions to ask of
the defendant on this point to make a record that hopefully will
be consistent with Mr. Hissam's statements in his sentencing
memorandum.  Is there any objection to that?

MS. THOMAS:  No objection, Your Honor.

MR. HISSAM:  No, Your Honor.

THE COURT:  All right.  All right.  Have you -- Mr.
Barnette, I'm going to ask you a couple of questions and this is

1    in reference to your interview by the agents on March 22nd, 2014,

2    in which you were not truthful with them, as you have admitted in

3    your Stipulation of Facts and as you've pled guilty to.  So, you

4    understand what I'm going to be asking you about?

5                    THE DEFENDANT:  Yes, sir.

6                    THE COURT:  All right.  Were -- and I've got about

7    three questions to ask you.  Were you aware that the law imposed

8    upon you some duty not to make false statements to these IRS,

9    FBI, and other investigators?

10                   THE DEFENDANT:  Yes, Your Honor.

11                   THE COURT:  And did you believe that making false

12   statements to the IRS, the FBI, and the others in this interview

13   was unlawful in a general sense?

14                   THE DEFENDANT:  Yes, sir.

15                   THE COURT:  And were you aware, in a general sense,

16   that making false statements to the IRS and FBI investigators was

17   unlawful?

18                   THE DEFENDANT:  Yes, Your Honor.

19                   THE COURT:  All right.  Based on those statements and

20   my other findings, I will find that there is a basis in fact for

21   this plea based upon the entirety of the record before me, and I

22   will adjudge the defendant guilty of the crime to which he has

23   pled guilty, and accept the plea agreement that was previously

24   filed.

25        Pardon me just a moment.

1        (Pause).

2            THE COURT:  Ms. Thomas, I have been made aware that you

3    intend to make a motion under Section 5K1.1.  You did not provide

4    a memorandum on that, did you?

5            MS. THOMAS:  I did not.  I did not.

6            THE COURT:  Okay.  All right.  Do we need to have an

7    in-camera hearing on that?

8            MS. THOMAS:  No, Your Honor, I don't believe so.

9            THE COURT:  Mr. Hissam?

10            MR. HISSAM:  No, sir.

11            THE COURT:  All right.  Very well.

12        Pursuant to Section 5K1.1 of the U. S. Sentencing

13    Guidelines, the Court may depart from the guidelines upon motion

14    of the government, stating that the defendant has provided

15    substantial assistance in the investigation or prosecution of

16    another person.

17        In determining the motion and the appropriate reduction, the

18    Court may consider:

19        One, the significance and usefulness of the defendant's

20    assistance;

21        Two, the truthfulness, completeness and reliability of any

22    information or testimony provided by the defendant;

23        Three, the nature and extent of the defendant's assistance;

24        Four, any injury suffered or any danger or risk of injury to

25    the defendant or his family resulting from his assistance;

1          And, finally, the timeliness of the defendant's assistance.

2          Ms. Thomas, I'll hear your motion now.

3          MS. THOMAS:  Your Honor, the United States makes a

4     motion for a four-level substantial assistance under the

5     guidelines.  Mr. Barnette provided documentation of the kickbacks

6     that he made or -- or that MRS made to Mr. Runion.  This

7     documentation was -- I believe Mr. Hissam actually addressed this

8     in his sentencing memo, as well.  It was contemporaneous notes of

9     the amount of kickbacks, where the kickbacks were paid, as in

10    like a restaurant or whatever, and the amount of the kickbacks

11    based on the job that was performed at Mt. Laurel.

12         This was useful to the investigation in relation to the

13    prosecution of Mr. Runion because it put -- both put money in his

14    hand, the kickback itself, and also, the documentation of the

15    kickbacks is fairly unusual.  That was the only type of evidence

16    that we had in this case where -- that we knew of where someone

17    had actually written down how much money they paid them and when

18    they paid them.

19         Significant and useful to the investigation, it was also

20    fairly timely.  He -- Mr. Barnette approached the United States

21    through counsel shortly after his interview that's the basis of

22    this charge, to let the government know about the information

23    that he had.

24         THE COURT:  And the -- did Mr. Barnette's information

25    lead to guilty pleas from any other particular parties, including

1  Mr. Runion?

2          MS. THOMAS:  Mr. Runion, Your Honor.

3          THE COURT:  All right.

4      All right.  Mr. Hissam, anything to add?

5          MR. HISSAM:  No, sir.

6          THE COURT:  All right.  I will adopt the government's

7  comments.  The -- and it sounds as if this defendant's

8  information was significant to the investigation and the

9  development of -- what I know was a rapidly developing

10 investigation at the time and I rely on the government's

11 assessment of the appropriate number of levels.

12     So, I will grant the motion, and I will, as requested by the

13 government, grant a four-level reduction based on this

14 defendant's substantial assistance, and I will adopt the

15 government's comments as my findings as to the factors to be

16 considered.

17     I am now ready to give my tentative findings as to the

18 applicable guidelines.  First, is there a motion for the third

19 level for acceptance of responsibility?

20          MS. THOMAS:  Yes, Your Honor.

21          THE COURT:  That motion will be granted.

22     Therefore, I find a Base Offense Level of 6; plus 18, based

23 on the amount of the kickbacks; minus 3 for acceptance of

24 responsibility; and minus 4 for the 5K motion, for a Total

25 Offense Level of 11; a criminal history category of I based on 0

criminal history points, yielding an imprisonment range of 8 to
14 months, which is in Zone B, which allows for probation with
certain conditions of confinement; 1 to 3 years of supervised
release; 1 to 5 years of probation; and a fine range of $2,000.00
to $20,000.00; and a mandatory special assessment of $100.00.

Are there any legal objections to my tentative findings as
to the applicable guidelines?

MS. THOMAS:  No, Your Honor.

MR. HISSAM:  No, Your Honor.

THE COURT:  One comment I will make is that the
Presentence Report indicates that the maximum fine $600,000.00,
which I believe is based on the notion that it's twice the amount
of the loss.  However, I think for loss calculation purposes and
relevant conduct under the guidelines, that may be appropriate,
but under Section 3571, I don't believe that those were losses
attributable to this offense of conviction and, therefore, I
don't believe that that provision applies.  Therefore, the
statutory maximum fine is $250,000.00 and the guideline range is
$2,000.00 to $20,000.00.

Any objection based on that?

MS. THOMAS:  Your Honor.

MR. HISSAM:  No, Your Honor.

THE COURT:  And I do note that the special assessment,
according to the docket, has already been paid, as well as a
$400,000.00 forfeiture that has already been paid, as well, has

1   it not?

2          MR. HISSAM:  That is correct, Your Honor.

3          THE COURT:  All right.  Very well.

4      Ms. Thomas, I note that there -- I don't know, actually, if

5   this applies in this case, but I will ask you this quickly

6   anyway.  To the extent that there are victims, or a victim, in

7   connection with this particular offense of conviction, and I

8   don't know if that applies or not, but I know Arch Coal, in

9   general, is the victim in these cases.  To the extent -- to that

10  extent then, has Arch been provided with all the appropriate

11  rights and notifications required under the various victims

12  rights statutes in connection with this case?

13         MS. THOMAS:  With this case, I don't know that they

14  have because the offense of conviction is false statement, so I

15  don't know that there's actually a victim under the victims

16  rights statute.  However, I do believe that Mr. Carey is here and

17  he is an attorney for Arch Coal.

18         THE COURT:  All right.  So they're aware of it.  I

19  assume -- Mr. Carey is standing.  I assume Arch does not want to

20  address the Court on this?

21         MR. CAREY:  No, Your Honor.  We would waive any notice.

22  To the extent that they weren't provided, I'm here in person, so

23  we would waive any notice.

24         THE COURT:  All right.  Very well.

25      For the record, that is Attorney Michael Carey, who I know

1    is counsel for Arch Coal in connection with these matters.

2        All right.  Mr. Barnette, at this time, the Federal Rules of

3    Criminal Procedure give you a the right to make any statement

4    that you would like to make, although you're not obligated to

5    make any statement.  However, if you do choose to make a

6    statement, I would ask that you stand to do so.

7            THE DEFENDANT:  Yes, Your Honor.  I would like to

8    apologize for the action I took and apologize to my family, and

9    friends, and my employees that have suffered from it.  I've

10   learned my lesson.

11           THE COURT:  I'm sorry?

12           THE DEFENDANT:  I've learned my lesson.

13           THE COURT:  All right.  Thank you, sir.  You may be

14   seated.

15       Mr. Hissam, anything else on behalf of the defendant before

16   I impose sentence?

17           MR. HISSAM:  Yes, Your Honor, briefly.  We've discussed

18   the fact pattern and the timing and the sequence.  I think the

19   Court is aware of that.

20       I will just add that it is clear that the government never

21   asserted Mr. Barnette committed any tax violations or structured

22   monetary transactions in connection with his payments and, as I

23   noted before, he did -- he went from avoiding Mr. Runion and

24   avoiding the demand for ten percent of payments, to a situation

25   in which he avoided -- he stopped paying altogether and, although

his business suffered a hit, it came down over a million dollars
per year after he quit paying, he was still doing over
$3,000,000.00 in 2012, and $3,000,000.00 in 2013 of sales to Mt.
Laurel, and that's simply a reflection, Your Honor, of the high
quality and important work that this shop, this particular
rebuild shop, Mining Repair, did at Mt. Laurel.  They worked on
continuous miner machines and roof bolter machines at a regular
rate of production at a highly profitable coal mine and, even
when he stopped making the payments, it just wasn't a possibility
for him to completely stop and, honestly, that's why he -- if Mr.
Barnette had it to do all over again, he wouldn't have made those
payments.  He wouldn't have conceded to that threat.

    I do want to mention a couple of things, Your Honor, in the
government's sentencing memorandum.  One is the assertion that
had Arch known of these payments to Mr. Runion in the amount of
$300,000.00 estimated that they could have charged -- that they
could have charged $300,000 -- paid $300,000.00 less to Mining
Repair, but there's no factual support for that assertion, Your
Honor.

    The pricing, and the process of obtaining work, the bid
process of obtaining work, and the quality of the work, was
unchanged, and the government has never asserted otherwise,
before the payments or demands were made, during the time period
of the payments, and after Mr. Barnette ceased making payments to
Mr. Runion.

The competitive environment, the nature in which Arch Coal, through Mt. Laurel, did business with Mining Repair was not changed, and there was no assertion that he was raising, by Mr. Runion's urging, that Mr. Barnette was ever raising his prices, fraudulently billing, or creating false invoices for work he did not actually perform.  The work he was paid for by Arch Coal at Mt. Laurel was work that this shop performed.

And Ms. Thomas also raises the point that kickbacks create an economic risk, an inherent economic risk, for the coal industry, or the employer of the payee, that shoddy work or sub-standard work won't be reported.  Again, I want to be clear, and I think Ms. Thomas concedes this in her memorandum, but I want to be clear that there's never an assertion here that Mining Repair did anything but top notch, quality, timely work that Arch Coal was happy with.

Your Honor, I do want to mention a couple of the sentencing factors stressed in the memorandum that the defendant filed.  One is, as we've already discussed, the early acceptance and the early engagement of counsel and the decision to come and enter into this guilty plea.

Second, Your Honor, the unwarranted sentencing disparities. The Court's familiar with Mr. Herndon's and Mr. Porter's sentencing hearings and that they each received sentences of probation.

I just would note, Your Honor, that Mr. Herndon, unlike Mr.

Barnette was, at one point in time, inside at Arch and, by that, I mean, he was working at Arch at Mt. Laurel in the position of having demanded payments from vendors.  Mr. Barnette was never in that role.

And Mr. Porter, on the other hand, Your Honor, had pled guilty in this court to tax violations in connection with these kickback payments.  As I mentioned, Mr. Barnette was not involved with tax violations or structured monetary transactions.

Finally, Your Honor, the deterrence factor, Mr. Barnette has expressed his remorse and regret, and that comes from a sincere place, because he, in May of 2014, was kicked off of his primary customer's property.  He lost his customer.  He list his business.  He laid off his employees, many of whom are here today.

It was a -- it's a family business.  He had -- he and his wife had spent their lives building this business, working it every day, and it's gone, and so, he has paid dearly.  He paid more than $100,000.00 more than the estimated payments to Mr. Runion in forfeiture, and he stands here today as a convicted felon, and he has -- he has paid for participating in the culture of corruption in Southern West Virginia.

THE COURT:  Thank you, Mr. Hissam.

Ms. Thomas?

MS. THOMAS:  Mr. Barnette was untruthful in this investigation, made a false statement, and that's the crime, but

he made this statement in an attempt to hide what he had been up to at Mt. Laurel and he knew that both making a false statement was wrong and that paying the kickbacks were wrong.

These kickbacks that are the subject of his false statement gave MRS, his company, an advantage in receiving work at Mt. Laurel. It wasn't mere coercion or acquiescence. It was, at his heart, a secret business deal between MRS and Mr. Runion, where there was a tit for tat. You pay, I send you work.

Mr. Barnette believed that those payments were necessary to retain that work at Mt. Laurel. So, who doesn't win after -- out of this? The company, who should have -- the company that Mr. Barnette's company was doing the work for. They should have known that they could have gotten a better deal.

What's it worth? At least $300,000.00, to however much Mr. Barnette paid, and except -- and there's also the other companies, who we don't get to hear from, who weren't paying to play at Mt. Laurel. They weren't giving Runion cash in exchange for work and I would ask the Court to consider that when imposing sentence.

THE COURT: All right. I want to take a moment to review my notes, so I'm going to take about another ten-minute break, and I'll be back to impose sentence at that time.

(Recess taken).

THE COURT: All right. After consideration of the advisory guidelines and the other applicable factors under 18 U.

S. C. Section 3553(a), I am now ready to impose sentence.

Will the defendant please stand?

Mr. Barnette, you became a part of what I have often talked about as the culture of corruption in Southern West Virginia as a part of this kickback scheme and -- but, as I looked at that, as far as I can see, other than being required to make these payments, in this case, I think your case is similar or, in this instance, I think your case is similar to Dallas Porter's. It seems to me that you got nothing out of it other than to continue to do the work that you were already doing.

As I indicated in the Porter case, there's a good argument to be made that you were as much a victim of a shakedown as anything and, if that were all there were to this, the sentence you would get would be very minimal, but that's not all you did.

You also participated in this by making bids at the request of Griffith. You participated in the bid rigging business regarding Tri-State, and then you lied to the FBI and the IRS about the whole kickback thing. So, that's -- that -- the count of conviction, in particular, is a very serious offense that requires a just punishment. It also requires a sentence that sends a message that there is a penalty to be had from lying to or misleading investigators in these cases.

Now, I note that you have no criminal history and that, as far as I can tell, or than this episode, you have been a very hard-working family man who has contributed significantly to your

community, as reflected in the letters that I have read.  I
believe that you are very unlikely to re-offend and, therefore,
no prison term is necessary for you.

Based on all of these factors then, it is the judgment of
this Court that you be sentenced to a period of three years of
probation, the first six months of which shall be served on home
confinement with electronic monitoring under the standard
conditions of that program in this district.  You will not be
allowed to leave your home except for absences approved in
advance by the probation officer for religious services, medical
appointments, school, work or other absences approved in advance
by the probation officer.

While on probation, you must not commit another federal,
state or local crime; you must not possess a firearm or other
dangerous weapon; and you must not unlawfully possess a
controlled substance.

You also must comply with the standard terms and conditions
of probation as recommended by the U. S. Sentencing Commission
and as adopted by this Court, except that you need not
participate in a program of testing, counseling and treatment for
drug and alcohol abuse, as that does not appear to be an issue
based on your Presentence Report.  You must also abide by the
special conditions of probation as set forth in the local rules
in this court.

I am going to impose a fine of $20,000.00.  I will make that

due immediately, but I will allow you to pay that within the next
90 days.  However, if you do not pay that within the next
15 days, it will begin to incur interest, so I'm not going to
waive the interest on the fine.

I believe the special assessment and forfeitures have
already been paid.

You may be seated.

Mr. Barnette, you -- I note that there is a significant
appeal waiver contained in your plea agreement.  As qualified by
that wavier, you have the right to appeal the judgment of this
Court.  Any Notice of Appeal must be filed with the Clerk not
more than 14 days from the date of the entry of the judgment
order.

If you desire counsel on appeal and you are unable to retain
counsel, the appropriate court will review a financial affidavit
filed by you to determine whether or not to appoint counsel.

Do you understand your right to appeal and the 14-day filing
requirement?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  I will place the Presentence
Report under seal subject to counsel's right to unseal, as
necessary, for appeal.

Any other matters we need to take up in this case?

MS. THOMAS:  No, Your Honor.

MR. HISSAM:  No, Your Honor.

1    THE COURT:  All right.  Thank you.

2        (Proceedings concluded at 11:25 a.m., February 25, 2015.)

3

4  CERTIFICATION:

5      I, Ayme A. Cochran, Official Court Reporter, certify that

6  the foregoing is a correct transcript from the record of

7  proceedings in the matter of United States of America, Plaintiff

8  v. Ronald Barnette, Defendant, Criminal Action No. 2:14-cr-114,

9  as reported on February 25, 2015.

10

11  s/Ayme A. Cochran, RMR, CRR                February 26, 2015

12  Ayme A. Cochran, RMR, CRR                         DATE

13

14

15

16

17

18

19

20

21

22

23

24

25